UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EBS DEALING RESOURCES, INC.,        :
a Delaware Corporation                         :
                                                       :
                        Plaintiff,           :        04 Civ. 583 (HB)
                                                       :
            -against-                    :        OPINION AND ORDER
                                                       :
INTERCONTINENTAL EXCHANGE, INC.,    :
a Delaware Corporation,                       :
                                                       :
                        Defendant.        :
------------------------------------------------------------x

**Hon. Harold Baer, Jr., District Judge**[*]**:**

On January 26, 2004, Plaintiff, EBS Dealing Resources, Inc. ("EBS"), initiated the instant action for patent infringement against Defendant, Intercontinental Exchange, Inc. ("ICE"). EBS seeks: (1) declaratory judgment of willful and wanton patent infringement and (2) injunctive relief and damages in accordance with 35 U.S.C. § 283 et seq. (Dckt. 1.) On June 7, 2005, in accordance with Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996), a hearing was held to determine the meanings of the disputed portions of the claim and EBS's Motion to Strike ICE's Seventh Affirmative Defense.[1] The matter was sub judice on June 22, 2005. For the following reasons, the claim will be construed as set forth below, and Plaintiff's Motion to Strike Defendant's Seventh Affirmative Defense is GRANTED.

## I.     BACKGROUND

On December 20, 1994, and January 11, 2000, the United States Patent and Trademark Office ("USPTO") issued patent Nos. 3,375,055 (the "'055 Patent") and 6,014,627 (the "'627 Patent"), respectively, to Michael Togher, Michael F. Dunne, and Richard Hartheimer. EBS is the assignee of the '627 Patent, entitled "Credit Management for Electronic Brokerage System." The '055 and '627 patents relate to an "electronic trading system for distributing anonymous

---

[*] Paul-Philippe L. Reyes, a summer 2005 intern in my Chambers, and currently a second year law student at Brooklyn Law School, provided substantial assistance in the research and drafting of this Opinion.

[1] EBS additionally moved to strike ICE's Sixth and Tenth Affirmative Defenses, which related to the '055 Patent. On June 3, 2005, however, EBS and ICE stipulated to dismiss "all claims and defenses relating to the '055 patent." (Dckt. 38) (Stipulation and Order of Dismissal, dated June 3, 2005.) As a result of the Stipulation and Order, the Court need not consider or decide on any portion of Plaintiff's Motion to Strike relating to the '055 Patent. See Shapiro v. AOE/Ricoh, Inc., No. 96 Civ. 2058, 1997 WL 107641, at *1 (S.D.N.Y. 1997).

1

price quotes on a selective basis in accordance with previously established credit limits." U.S. Patent No. 6,014,627 (issued Jan. 11, 2000). On January 26, 2004, EBS brought the instant action against ICE for alleged infringement of the '055 and '627 Patents.

## II.     STANDARD OF REVIEW

"It is the claims that measure the invention," SRI Intern v. Matsushita Elec. Corp. of Am., 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc), and claim construction is a matter of law. Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370 (1996). The process begins with the language of the Claim itself, which is to be read and understood as it would be by a person of ordinary skill in the art. See Vanderlande Indus. Nederland BV v. I.T.C., 366 F.3d 1311, 1318 (Fed. Cir. 2004) (citation omitted); see also Dow Chem. Co. v. Sumitomo Chem. Co., 257 F.3d 1364, 1372 (Fed. Cir. 2001). In construing a claim, the Court may examine both intrinsic evidence (e.g., the patent, its claims, the specification and file history) and, if necessary, extrinsic evidence (e.g., expert reports, testimony, and anything else). See Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999). In interpreting the disputed terms, it is well settled that a court should look first to the intrinsic evidence. See Goldenberg v. Cytogen, Inc., 373 F.3d 1158, 1164 (Fed. Cir. 2004). Extrinsic evidence is considered only where the intrinsic evidence does not provide a sufficient description to resolve ambiguities in the scope of the claim. Id., (citing to Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1583 (Fed. Cir. 1996); see also Johnson Worldwide Assoc., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999). The definition of a claim term may be altered from its ordinary and accustomed meaning if "clearly and deliberately" set forth in the intrinsic evidence, such as the written description and prosecution history. See Merck's Co. v. Teva. Pharm. USA, Inc., 395 F.3d 1364, 1370 (Fed. Cir. 2005) (citing to Union Carbide Chems & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1177-78 (Fed. Cir. 2002). For instance, arguments made during the prosecution of a patent application to distinguish the claimed invention over the prior art may limit the scope of construction of the claim term, and should be given the same weight as claim amendments. See Elkay Mfg. Co. v. Ebco Mfg. Co., 192 F.3d 973, 979 (Fed. Cir. 1999); see also Southwall Techns., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).

## III. CLAIM CONSTRUCTION

The parties seek construction of certain terms in Claim 17 of the '627 Patent, an undisputed "method claim."[2] Claim 17 of the '627 Patent provides:

> A computerized trading method for trading of financial instruments between traders trading at respective trading floors, said method comprising
>
> generating electronic price quotation messages including bid and/or offer prices for a particular financial instrument from one or more of the trading floors,
>
> automatically administering credit on a unilateral basis from each of the trading floors to the other trading floors,
>
> automatically deriving a respective dealable price message for said particular financial instrument only from price quotation messages from those other trading floors for which bilateral credit currently remains both from and to a particular trading floor, and
>
> automatically communicating said dealable price message on an anonymous basis to a trader at said particular trading floor without disclosing the origin of the price quotation messages from which the dealable price message was derived.

U.S. Patent No. 6,014,627 (issued January 11, 2000). Within Claim 17, these specific terms are sought to be construed: "financial instrument," "automatically administering credit on a unilateral basis," and, "automatically deriving a respective dealable price message."

While ICE asserts that only the aforementioned terms need construction, EBS contends that these additional terms require construction: "trading floors," "generating electronic price message," and, "automatically communicating said dealable price message." (Siff, Att'y for Pl., Hr'g Tr. 31:16-23.)

---

[2] "A method claim is a series of steps of manipulation, whether the steps would be performed wholly by machine or partly by a person, so long as they are not purely mental steps (an algorithm, which is dealt with in connection with electronics and computer claims)." See Robert C. Faber, 12th Annual Advanced Patent Prosecution Workshop: Claim Drafting & Amendment Writing: The Winning Mechanical Claim, 730 Prac. Law Inst. Pat 241, 266 (2002). Alternatively, an apparatus claim talks about the structural elements of an invention. Robert C. Faber, Landis on Mechanics of Patent Claim Drafting, at X-45 (4th ed. 2002) ("[A]n apparatus claim is not merely a catalog of parts, [but] it absolutely must include a catalog of parts. It is the cataloging of the parts that gives rise to what we call the positive recitation of the elements. That is, each structural element in the claim must be set forth directly and independently of every other element.").

3

A.  **"Financial Instrument"**

EBS argues that when taken together, the prosecution history and the ordinary meaning of the term, "financial instrument" requires the broadest of definitions:

> Any instrument (e.g., note, contract, agreement) having monetary value.

(Gingher, Att'y for Pl., Decl., Ex. 2 at 1.)  EBS comes to this conclusion by synthesizing definitions from two financial dictionaries, the Dictionary of Banking and Financial Services, 294 (2d ed. 1985), and the Dictionary of Financial and Investment Terms, 202 (3d ed. 1991).

Conversely, ICE argues that EBS's construction is overbroad, outside the scope of the '627 Patent, and should be more narrowly construed.  ICE emphasizes a definition of "financial instrument" constrained by the understanding of one skilled in the art of finance and trading at the time the '627 Patent was issued.  (Harrison, Att'y for Def., Hr'g Tr. 15:6-9.)  According to ICE, one skilled in the art would understand a "financial instrument" to mean "a contract involving currency, equities, securities, fixed securities, or indexes thereof."  (Harrison, Att'y for Def., Hr'g Tr. 13:6-8.)  In other words, a financial instrument "must have some underlying financial asset." (Harrison, Att'y for Def., Hr'g Tr. 13:10-11.)  In particular, ICE maintains that "financial instrument" does not include "commodities" and points to the fact that the Commodities and Futures Trading Commission (CFTC) website distinguishes between "commodities" and "financial instruments."  (Harrison, Att'y for Def., Hr'g Tr. 53:11-17.)

The industry to which the '627 Patent relates is that of "traders dealing in financial instruments."[3]  U.S. Patent No. 6,014,627 (issued Jan. 11, 2000).  In general, the term, "financial instruments," does not appear to include only those instruments directly tied to an underlying financial asset.  For example, the Dictionary of Banking and Finance, 159 (Standard Chartered Bank, 1st Ed., 1998), defines financial instrument as:

> A contractual claim held by one party on another, such as a security, currency, or derivatives contract.  A financial instrument entitles the other to be paid in cash or with another financial instrument.

The Handbook of International Financial Terms, 220 (Oxford Univ. Press, 1st Ed., 1997), maintains an even broader definition:

---

[3] This Court, like other courts in this district, notes that the Federal Circuit is currently examining the role of dictionaries in claim interpretation.  See Philips v. AWH Corp., 376 F.3d 1382 (Fed. Cir. 2004); see also Astrazeneca Pharma., LP v. Mayne Pharma., Inc., 352 F. Supp. 2d 403 (S.D.N.Y. 2004).

4

> Generic term for those securities or contracts which provide the holder with a claim on an obligor. Such instruments include common stock, preferred stock, bonds, loans, money market instruments, and other contractually binding obligations. The common feature which differentiates a financial instrument from a commercial or trade credit is the right to receive cash or another financial instrument from the obligor and/or the ability to exchange for cash the instrument with another entity. The definition can also include instruments where the claim is contingent, as with derivatives.

In the same vein, The McGraw-Hill Dictionary of International Trade and Finance, 202 (McGraw-Hill, 1st Ed., 1994), defines an instrument as:

> [A]n enforceable contract obligating one party to pay money or transfer property to another. Credit documents, (e.g. drafts, bonds, etc.,) are instruments, as are documents of title, such as deeds or stock certificates.

The aforementioned dictionaries do not limit or restrict the definition of "financial instrument" to the characteristics of an intangible asset. While financial instruments are as a rule created to raise capital, the definition of a financial instrument is not contingent upon the underlying asset being a physical asset such as currency. For instance, the Department of the Treasury, 12 C.F.R. §§ 563, 567, simply provides that:

> A fundamental characteristic of all financial instruments is that they give rise to cash flows. The value of any financial instrument can be estimated by projecting the amount and timing of future net cash flows associated with the instrument, and discounting those cash flows with appropriate discount rates.

See 12 C.F.R. §§ 563; 567. As such, reading the '627 Patent in light of the relevant industry standards and the ordinary meaning of the terms, at least insofar as current dictionary definitions are concerned, the contested language must be construed as:

> Any enforceable instrument having a monetary value.

**B.    The Step-Plus Function Limitation**

ICE argues that the remaining terms, "automatically administering credit on a unilateral basis," and "automatically deriving a respective dealable price message," are "step-plus-function Claims" and are limited by 35 U.S.C. § 112 ¶ 6 (the "112(6) limitation"). Section 112 ¶ 6 allows a patentee to "describe an element of the invention by the result accomplished or the function served, rather than by describing the element to be used." Warner-Jenkinson Co., v. Hilton Davis Chem. Co., 520 U.S. 17, 27 (1997). According to 35 U.S.C. § 112 ¶ 6:

5

> An element in a claim for a combination may be expressed as a means or a step for performing the specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112 ¶ 6 (2000). However, "the price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description and equivalents thereof." Tex. Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1208 (Fed. Cir. 2002) (citing to O.I. Corp. v. Tekmar Co., Inc., 115 F.3d 1576, 1583 (Fed Cir. 1997)). As such, the patentee shoulders "the duty to link or associate structure in the specification with the function [as] the quid pro quo for the convenience of employing the [statute]." B. Braun Med., Inc. v. Abbott Lab., 124 F.3d 1419, 1424 (Fed. Cir. 1997). However, if the patentee fails to sufficiently describe the structure, material, or act to which the function corresponds, the claim is overbroad and therefore, invalid. Budde v. Harley-Davidson, Inc., 250 F.3d 1369, 1376 (Fed. Cir. 2001) ("[F]ailure to disclose adequate structure corresponding to the recited function in accordance with 35 U.S.C. § 112, paragraph 1, results in the claim being of indefinite scope, and thus invalid, under 35 U.S.C. § 112, paragraph 2.").

In O.I. Corp. v. Tekmar Co., 115 F.3d 1576 (Fed Cir. 1997), the Federal Circuit analyzed whether the 112(6) limitation applies to a "step" or "method" claim as opposed to when it limits an apparatus claim. The Federal Circuit concluded that "the term 'steps' [refers] to the generic description of elements of a process and the term 'acts' [refers] to the implementation of those steps," and that the 112(6) limitation "is implicated only when steps plus function without definite acts are present." See O.I Corp. at 1583 (emphasis added). The Federal Circuit reasoned that: "Claiming a step by itself, or a series of steps, does not implicate section 112, ¶ 6. Merely claiming a step without recital of a function is not analogous to a means plus a function." O.I. Corp., 115 F.3d at 1583 (Fed. Cir. 1997); Cardiac Pacemaker, Inc., 381 F.3d at 1382 (Fed. Cir. 2004) (A method claim "necessarily recites the steps of the method.").

The Federal Circuit reviewed a patent which claimed: "A method comprising the steps of: (a) passing an analyte slug through a passage." O.I Corp., 115 F.3d at 1578. The Federal Circuit held that the act of "passing an analyte slug through a passage" did not constitute a function simply because the operative verb was in the imperfect tense, "such as passing, heating, reacting transferring etc." Id. The Federal Circuit noted that if it were "to construe every process

6

claim containing steps described in an 'ing' verb," then every process claim would be subject to the 112(6) limitation. Id.; see also Cardiac Pacemaker, Inc., 381 F.3d at 1371 (Fed. Cir. 2004) ("[A] patentee can define a method or process claim containing steps that begin with a gerund . . . without necessarily subjecting the claim to § 112 ¶ 6 limitations.") While it indicated that verbs in the imperfect tense do not in themselves implicate the 112(6) limitation, the Federal Circuit left it to the trial courts to establish whether a claim element was a function or an act.

The Federal Circuit subsequently clarified when claim language is to be construed as a function as opposed to an act in Masco v. United States, 303 F.3d 1316 (Fed. Cir. 2002). In Masco, the Federal Circuit expanded upon its reasoning in O.I. Corp., and further advised when claim language describes acts or functions:

> The "underlying function" of a method claim element corresponds to what the element ultimately accomplishes in relationship to *what* the other elements of the claim and the claim as a whole accomplish. "Acts," on the other hand, correspond to *how* the function is accomplished.

Masco, 303 F.3d at 1327 (citing to Seal-Flex, Inc. v. Athletic Track and Ct. Constr., 172 F.3d 836, 849-50 (Fed. Cir. 1999) (per curiam) (Rader, J., concurring) (emphasis in original)). The Federal Circuit held that "where a method claim does not contain the term 'steps for,' a limitation of that claim cannot be construed as a step-plus-function limitation without a showing that the limitation contains no act." Masco, 303 F.3d at 1327 (emphasis added). Indeed, if any act is present in the claim element language, then the 112(6) limitation is inapplicable to the claim element. In Masco the claim language was, "[T]he method comprising the steps of . . . transmitting a force . . . to drive the lever into a position where the protrusion can contact the surface of the cam wheel," and the Federal Circuit determined that both a function and an act were present. Masco, 303 F.3d at 1327. While the underlying function of "transmitting a force" was "to drive the lever into the cam," the Federal Circuit found that "transmitting" was an act, and "a limitation of a claim cannot be construed as a step-plus function limitation without a showing that the limitation contains no act." Id. at 1327-28. Accordingly, under the Federal Circuit's holdings in O.I. Corp. and Masco the 112(6) limitation applies when:

> (1) the claim limitation uses the phrase "step for"; (2) the "step for" is modified by functional language; and (3) the phrase "step for" is not modified by sufficient structure, material, or acts for achieving the specified function.

See, e.g., Supp. Exam. Guidelines for Determining the Applicability of 35 U.S.C. § 112 ¶ 6, 65 Fed. Reg. 38510 (June 21, 2000). Therefore, if the Claim language contains any act linked to functional language, an analysis under, 35 U.S.C. § 112 ¶ 6 is not warranted.[4]

Here, relying on <u>Masco</u> ICE contends, Claim 17 does not contain acts, but rather merely states functions. (Harrison, Att'y for Def., Hr'g Tr. 63:12.) In other words, ICE asserts that Claim 17 states *what* the elements of the claim ultimately accomplish (the function), but does not state *how* the function is accomplished. <u>Id</u>. ICE asks: "Where is the how?" <u>Id</u>. In opposition, EBS asserts that, similar to the language in <u>O.I. Corp.</u>, the terms are just a recital of steps that do not state a function. (Siff. Att'y for Pl., Hr'g, Tr. 10:7-8.)

In accordance with <u>Masco</u> and <u>O.I. Corp.</u>, the 112(6) limitation does not apply for two reasons. First, the disputed claim does not contain the language "step for" and, therefore, the 112(6) limitation is presumed not to apply. Second, as the Federal Circuit found in both <u>O.I Corp</u> and <u>Masco</u>, the operative verbs "administering" and "deriving" do not themselves indicate the presence of functions.

First, it is undisputed that Claim 17 of the '627 Patent does not contain the language "step for." U.S. Patent No. 6,014,627 (issued January 11, 2000). As noted, the lack of the language "step for" generally signals that an act, rather than a function, follows. <u>See</u> <u>Cardiac Pacemaker, Inc.</u>, 381 F.3d at 1382. While not dispositive, "[s]uch a grammatical structure indicates that this is not a step-plus function claim," or at least creates a heavy "presumption that each ensuing step is [not] in step-plus function form." <u>Amgen, Inc. v. Hoechst Marrion Roussel, Inc.</u>, 339 F. Supp. 2d 202, 255 (D. Mass. 2004); <u>see</u> also <u>Cardiac Pacemaker, Inc.</u>, 381 F.3d at 1382; <u>Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.</u>, 279 F.3d 1022, 1028 (Fed. Cir. 2002); <u>Seal-Flex, Inc. v. Athletic Track & Ct. Constr.</u>, 172 F.3d 836, 850 (Fed. Cir. 1999) (Rader, J., concurring); Supp. Exam. Guidelines for Determining the Applicability of 35 U.S.C. § 112 ¶ 6, 65 Fed. Reg. 38510 (June 21, 2000) ("[A] claim element that does not include the phrase [] "step for" will not be considered to invoke 35 U.S.C. 112, 6.").

---

[4] While not binding on this Court, in 1994 and 2000, the USPTO crafted guidelines for patent examiners indicating when 35 U.S.C. § 112 ¶ 6 applies. <u>See</u> Supp. Exam. Guidelines for Determining the Applicability of 35 U.S.C. § 112 ¶ 6, 65 Fed. Reg. 38510 (June 21, 2000); <u>see</u> <u>also</u> Gale R. Petersen & Derrick A. Pizarro, <u>Recent Developments in Patent law – Decisions by the U.S. Court of Appeals for the Federal Circuit</u>, 11 Tex. Intell. Prop. L.J. 483, 602 (2003) (discussing the application of <u>Masco</u> and <u>O.I. Corp.</u>); <u>see</u> <u>also</u> Bryan K. Wheelock, <u>35 U.S.C. § 112 ¶ 6 – Means For a Better Patent Protection</u>, 47 St. Louis U. L.J. 1065, 1084-1085 (2003) ("Therefore, for a method claim, § 112, paragraph 6 is implicated only when steps-plus-function are recited without acts and merely claiming a step by itself, or a series of steps, without recital of a function does not trigger the application of § 112, paragraph 6.").

8

Second, as in both the O.I Corp. and Masco, the disputed terms in Claim 17 are steps without functions. The verbs "administering" and "deriving" can be analogized in use and form in their respective claim elements to the verbs "passing" and "transmitting" in O.I Corp. and Masco, respectively. Additionally, as neither the claim language nor dictionaries of the art explicitly ascribe these verbs meanings particular to "traders dealing in financial instruments," they are interpreted according to their ordinary meaning in their respective clauses. According to their ordinary meaning in their respective clauses, the phrases "automatically administering credit on a unilateral basis" and "automatically deriving a dealable price message" do not state "what" is accomplished, but rather state steps as to "how" the ultimate function of Claim 17 accomplishes, the "trading of financial instruments between traders." U.S. Patent No. 6,014,627 (issued Jan. 11, 2000).

As such, the remaining terms do not implicate section 112 ¶ 6. Phrased in the "what" and "how" language of Masco, "administering" in the sense of dispensing, furnishing or tendering, describes how "administering credit on a unilateral basis" is performed. See Webster's Third New International Dictionary of the English Language Unabridged 27 (1993) ("Administer: to mete out, dispense."); see also Webster's Third New International Dictionary of the English Language Unabridged 27 (1993) ("Administration: furnishing or tendering according to a prescribed act."). Additionally, the '627 Patent itself suggests that "administering" means dispensing according to a prescribed act: "Each client site establishes and may subsequently vary or reset a credit limit for each possible counterparty." U.S. Patent No. 6,014,627 (issued Jan. 11. 2000). "Deriving" in the sense of gathering and arriving at a conclusion by deduction, is an act which describes how "deriving a dealable price message" is performed. See Webster's Third New International Dictionary of the English Language Unabridged 608 (1993) ("Derive: to gather or arrive at (as a conclusion) by reasoning and observation; deduce."); see also American Heritage Dictionary of the English Language 489 (4th ed. 2000).

Consequently, the terms "automatically administering credit on a unilateral basis" and "automatically deriving a respective dealable price message" are not subject to § 112 ¶ 6.

**1. "Automatically Administering Credit on a Unilateral Basis"**

As Claim 17 is not subject to § 112 ¶ 6, I construe the remaining terms in accordance with the claim language in light of the relevant industry standards, the plain language of the terms, and with an eye to what one knowledgeable in the field would find appropriate. EBS

avers that consistent with the Claim itself, and the ordinary meaning of the Claim terms, the phrase "automatically administering credit on a unilateral basis" should be construed as:

> Keeping track, without user intervention, of whether each trading floor extends credit to the other trading floors, on a one-way basis.

(Siff, Att'y for Pl., Hr'g Tr. 31:2-4.) ICE, on the other hand, argues that § 112 ¶ 6 applies and does not propose any construction of the terms in the absence of its application.

The term "automatically administering credit on a unilateral basis" consists of four terms, (i) "automatically," (ii) "administering," (iii) "credit," and (iv) "unilateral basis."

First, the parties do not dispute that "automatically" does not have any special meaning, and that it means "without user intervention," (Siff, Att'y for Pl., Hr'g Tr. 27:12-13), a definition pretty much in line with the American Heritage Dictionary of the English Language, 112 (4th ed. 2000), which defines "automatically" as the adverbial tense of "automatic" meaning: "acting or operating in a manner essentially independent of external influence or control; acting or done as if by machine; mechanical."

Second, "administering," as defined above in Webster's Third New International Dictionary of the English Language Unabridged, 27 (1993), is: "to mete out; dispense." As aforementioned, "administering" is also supported by the Claim language to mean, dispensing according to a prescribed act.

Third, "credit," according to The McGraw-Hill Dictionary of International Trade and Finance, 96 (McGraw-Hill 1994), means "in finance, an agreement to provide money, goods, or services in exchange for a borrower's promise to pay at a future date." Similarly, the Dictionary of Finance and Investment Terms, 117 (4th ed. 1995), defines "credit" as:

> Loans, bonds, charge-account obligations, and open account balances with commercial firms. Also, available but unused bank letters of credit and other standby commitments as well as a variety of consumer credit facilities.

Fourth, Claim 17 of the '627 Patent uses the term "unilateral basis" as involving an independent, one–sided action: "[F]rom those other trading floors for which bilateral credit currently remains both from and to a particular trading floor." U.S. Patent No. 6,014,627 (issued Jan. 11, 2000).

As such, reading the '627 Patent in light of the relevant industry standards and the ordinary meaning of the terms, at least insofar as current dictionary definitions are concerned, the contested language must follow the EBS construction and be construed as:

> Keeping track, without user intervention, of whether each trading floor extends credit to the other trading floors, on a one-way basis.

**2.     "Automatically Deriving a Respective Dealable Price Message"**

EBS contends that the phrase, "automatically deriving a respective dealable price message" means:

> Deriving a message sent to a trading floor (a potential taker) and indicating a bid or offer originating from another trading floor (a potential maker) with whom the potential taker has credit remaining.

(Siff, Att'y for Pl., Hr'g Tr. 32:1-4.)

"Automatically deriving a respective dealable price message" consists of (i) "automatically" (ii) "deriving" (iii) "respective dealable price message." As "automatically" and "deriving," already defined above, do not necessitate more attention here.

The term "respective dealable price message" is supported by evidence intrinsic in the '627 Patent. Claim 17 states: "price quotation messages from those other trading floors for which bilateral credit currently remains both from and to a particular trading floor." U.S. Patent 6,014,627 (issued Jan. 11, 2000). In further support, the term "dealable" consists of two conjoined root words, "deal" and "able." To deal means "to buy or sell, or to do business." Dictionary of Banking and Finance, 112 (Standard Chartered Bank 1998). Analogous to the verb "to deal," "deal" as a noun defined by the Handbook of International Financial Terms, 145 (Oxford Univ. Press 1997), is a "colloquial term for transaction." "Able," according to Webster's Third New International Dictionary of the English Language Unabridged, 4 (1993), means, "possessed of needed powers or of needed resources to accomplish an objective."

As such, reading the '627 Patent in light of the relevant industry standards and the ordinary meaning of the terms, at least insofar as current dictionary definitions are concerned, the contested language must follow the EBS construction and be construed as:

> Deriving a message sent to a trading floor (a potential taker) and indicating a bid or offer originating from another trading floor (a potential maker) with whom the potential taker has credit remaining.

**C.     Other Disputed Terms**

EBS also requests the construction of three additional claim terms, "trading floors," "generating an electronic price message," and "automatically communicating said dealable price

message." (Siff, Att'y for Pl., Hr'g Tr. 6:12-13.)  ICE maintains such terms do not need to be construed by the Court.  (Harrison, Att'y for Def., Hr'g Tr. 67:10-12.)

In accordance with well settled Federal Circuit precedent that the court should review the disputed claim terms "only to the extent necessary to resolve the controversy," EBS's request to construct the aforementioned terms is DENIED.  Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999).

### IV.     Motion to Strike

On April 13, 2005, EBS moved, pursuant to Fed. R. Civ. P. 12(f), to strike ICE's Seventh Affirmative Defense, on the grounds that ICE failed to plead with the particularity required by Fed. R. Civ. P. 9(b).  (Dckt. 21.)  In its Amended Answer, filed March 30, 2005, ICE's Seventh Affirmative Defense alleged:

> The claims of the '627 Patent are unenforceable because of Plaintiff's unclean hands, fraud on the Patent Office, and inequitable conduct.  Prior to the filing of the patent application that led to the issuance of the '627 Patent, at least one inventor was aware of the Reuters trading system, which was a material prior art reference.  Despite this awareness, Plaintiff failed to disclose the Reuters system to the Patent Office as applicable prior art.

(Dckt. 19.)

Pursuant to Fed. R. Civ. P. 12(f), a court may strike a pleading when "its allegations are devoid of any factual basis." Oy v. Rainin Instrument Co., Inc., No. 96 Civ. 7073, 1997 WL 576008 at *1 (S.D.N.Y. Sept. 16, 1997) (Baer, J.).  In a patent case such as this, the fraud based affirmative defenses must be pled in accordance with Fed. R. Civ. P. 9(b) ("Rule 9(b)"), which requires a party to set forth, "the circumstances constituting fraud . . . with particularity." See Rentrop v. The Spectranetics Corp., No. 04 Civ. 101, 2004 WL 1243608, at * 1 (S.D.N.Y. June 4, 2004).  In particular, Rule 9(b) requires the defendant to "outline the specific statements made, the defendant who made them, and the time and place they were made." Oy, No. 96 CIV. 7073, 1997 WL 576008 at *1, (citing to Wolf v. Wagner Spray Tech. Corp., 715 F. Supp. 504, 507 (S.D.N.Y. 1989)).

Here, ICE's Seventh Affirmative Defense does not satisfy the particularity requirement of Rule 9(b).  While ICE sufficiently alleges the party that made the statements, it fails to provide sufficient detail as to the content of those statements.  In particular, "the Reuters system" does not state in sufficient detail what EBS failed to disclose to the USPTO. See, eg., Oy, No. 96

12

CIV. 7073 (HB), 1997 WL 576008 at *1 (Plaintiff's statement that "at least one patent was not bought to the [US]PTO's attention" does not provide enough detail to meet 9(b) requirements). Indeed, there are potentially hundreds of Reuters systems which EBS failed to disclose to the USPTO because they were immaterial. Id. Moreover, ICE's argument is diluted if not undermined by the fact that at least one Reuters trading system is present in the '627 Patent specification, and was thereby disclosed to the USPTO. U.S. Patent No. 6,014,627 (issued Jan. 11, 2000). Accordingly, ICE has failed to plead its Seventh Affirmative Defense with the particularity required by Fed. R. Civ. P. 9(b).

ICE requests that it be permitted to submit a Second Amended Complaint should the Seventh Amended Defense lacks the specificity required by Rule 9(b). The general rule is that permission to replead is "usually afforded." Pross v. Katz, 784 F.2d 455, 459-60 (2d Cir. 1986). Furthermore, Rule 15(a) instructs that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).

EBS argues that it would be prejudiced if ICE were permitted to replead its Seventh Amended Defense because further discovery would be necessary and costly, and because ICE should have amended prior to the close of all fact discovery on February 15, 2005 as agreed to by the parties in the Amended Pretrial Scheduling Order. (Am. Pretrial Scheduling Order dated Oct. 26, 2004) (Dckt. 15.)

While the Pretrial Scheduling Order should of course guide the parties it is not sacrosanct and here EBS's contentions are belied by the fact that it was aware of the subject matter of the allegations, ever since ICE's original Answer and, consequently, further discovery is probably unnecessary but if it is necessary "[t]he burden of further discovery and motions is not a satisfactory basis to deny [a] motion to amend" a telephone conference with Chambers is in order. Middle Atl. Utils. Co. v. S.M.W. Dev'p. Corp., 392 F.2d 380, 386 (2d Cir. 1968); see also United States v. Cont'l Ill. Nat. Bank and Trust Co. of Chi., 889 F.2d 1248, 1254 (2d Cir. 1989); see also Official Comm. of Asbestos Claimants of G-I Holding, Inc. v. Heyman, No. 01 Civ. 8539(RWS), 2005 WL 1324806, at *3 (S.D.N.Y. June 6, 2005). Leave to amend is GRANTED.

## V. CONCLUSION

The term "financial instrument" in the asserted Claim elements of the '627 Patent is construed to mean "Any instrument (e.g. note, contract, agreement) having monetary value." The term "automatically administering credit on a unilateral basis" in the asserted Claim

13

elements of the '627 Patent is construed to mean, "Keeping track, without user intervention, of whether each trading floor extends credit to the other trading floors, on a one-way basis." The term "automatically deriving a dealable price message" in the asserted Claim elements of the '627 Patent is construed to mean "Deriving a message sent to a trading floor (a potential taker) and indicating a bid or offer originating from another trading floor (a potential maker) with whom the potential taker has credit remaining."

In addition, for the aforementioned reasons, EBS's Motion to Strike ICE's Seventh Affirmative Defense is GRANTED and ICE may have twenty (20) days from the date hereof to amend the Answer if it so chooses.

The Clerk of the Court is instructed to close this motion and remove this motion from my docket.

**IT IS SO ORDERED.**
**New York, New York**
**July 27, 2005**

_____
U.S.D.J.